Accounting manager, Consumer Education Administration and healthlike organizations. Brian Kornitzky. May it please the court, I'm, my name is Jeanna Rine, I represent Kornitzky Group, LLC, doing business as AeroBearings. This appeal arises out of a certificate revocation for a repair station by the FAA. The first issue I'd like to address is the construction of the procedural statute regulations and guidance at issue in this case, and the primary concern is that the process and technology employed by AeroBearings was approved and deemed acceptable after thorough documentation and inspection, and this inspection was thoroughly documented. Then it was disapproved by a new inspector alleging regulatory violation for conduct that had previously been deemed to be in compliance, and AeroBearings had no information as to what that alleged compliance might be until the report was issued on the same day as the revocation. The ALJ based his decision that the technical data was insufficient on this new inspector's opinion, which the ALJ deemed as representative of the FAA, so Chevron deference to this interpretation is not appropriate. The second issue I'd like to address is the sufficiency of the data. The ALJ and the NTSB both determined that they did not determine that the mil-spec was insufficient data, and they did not determine that the OEM design data was required. Instead, both of these tribunals determined that the missing computer data was the basis for the technical data insufficiency. Interestingly, the FAA on page 39 of its brief said that the lost computer data is not the data required by the regs. But then the FAA persists in requiring the OEM design data, and they did not appeal the NTSB decision on this. The basis for this allegation that the technical data was insufficient was an expert opinion by the FAA's expert, I'll call him Dr. Q, I can't pronounce his name, that it was possible that the polishing process employed by aero-bearings could remove too much material. He didn't take any measurements to make his determination that this could remove too much material, and he admitted that his opinion was based on a presumption. So, this formed the entire basis for this determination that there was an insufficiency of technical data supporting aero-bearings processes. The FAA on page 39 said that how much material is removed is not an element of the regulations at issue in this case. So, but the NTSB and the ALJ have revoked, or the NTSB revoked the certificate based on alleged insufficiency of data, or they said that even if the falsification issue were not there, this alleged insufficiency of technical data would support revocation. So the FAA is no longer asking for this material removal substantiation, or the missing computer data, apparently, according to page 39, and they do extensively talk about the missing computer data in the context of credibility, but when it gets down to what they really want, the FAA wants the OEM design data. And the OEM design specs are not appropriate for a repair station. Design specs of a bearing are based on what would be appropriate for under Part 21 for building a new aircraft, and the specifications would not allow for disassembly, which is a repair function, because Part 21 entities are not allowed to do repairs. So that would explain why a design spec would say, well, you can't disassemble this. But the mill spec, the TO-102 mill spec, describes in detail how to disassemble. And that's the basis that was approved by the FAA. But if the computer data was restored, and there's no evidence in the record that supports the NTSB's decision that the computer data could not be restored, and if AeroBearing had any inkling that this was really the problem, and the FAA would have said, hey, please give us this computer data, restore this, they would have been happy to do so. But the computer data involves which polishing compound does not work, which grit size does not work, which time limit does not work, and how many iterations do not work. There was data provided to the inspectors, and it's important to note that there's an FAA certification of the record, so that A6, FAA's Exhibit 6, is not listed, but the record page numbers are listed. I've referenced this twice in my brief, and I didn't catch the error until after my brief was written, but A5 is the GE design spec, to which my client did not have access, and that's two pages. And then A6 is the following, however number of pages, which is the engine manual to which my client did have access. So my client provided all of this technical data that's listed in my brief, and he also showed a graph of test measured roller elements that were measured according to the A6 specifications of the ABMA standard spec, which is approved by the FAA. And this was discussed in the transcript. Dr. Q also had access to the NASA spec, which supported the design of the equipment, and the Stanford documentation and the Los Alamos documentation, all of which explained how this equipment was designed, and none of that was deemed sufficient, and he insisted upon the OEM spec. This idea was rejected by the ALJ and the TSP, because obviously the OEM design spec would not be appropriate, and the ALJ and the NTSP both said, okay, well we'll revoke this based on missing computer data. But what needs to happen here, the problem is not insufficient data, the NTSP didn't even consider the technology. The problem is that the new PMI and the NTSP did not understand the technology, and they need to do that in order to evaluate the sufficiency of the technical data. I would also like to address the issue of major repairs. Neither the ALJ nor the NTSP made a determination that this was a major repair. And for that reason, non-compliance has not been proven. But on the merits of that issue, there are two prompts to the major repair argument in the briefing. One involves structural engine parts. Well, the idea of structural engine parts is only applicable on the issue of plating. There's no allegation in the complaint that plating was a problem, and the ALJ overruled evidence regarding any plating issues. So that aspect of the structural repair issue should not be considered by this court. The other aspect, both experts addressed the critical component aspect under the definition of major repair in 43 CFR 1.1, and that involves what happens if a bearing fails. So the testimony is that this is not a major repair, because if a bearing fails, it doesn't affect the airworthiness of the aircraft. But because this issue was not determined by either tribunal, it should not be considered by this court. Thank you. We'll hear from the government. May it please the Court. Chris Stevenson for the Respondent, Federal Aviation Administration. In light of the petitioner's arguments, I think it might be most helpful for me to talk about what technical data is, and why it's important here, and what the FAA was asking for. Technical data is in the nature of the engineering information described in Part 21. That's been established in a written FAA interpretation, a Collins interpretation. It was cited in the FAA brief. The reason that technical data is in the nature of engineering information is because when performing an overhaul, as the petitioner was doing in these cases, when you're done having performed the overhaul, you need to be able to verify that the component that you were working on is in an appropriate condition. That technical data is going to tell you what the original design status of the component was. It's also going to tell you what the limitations on that are. For example, what sort of surface defect is still an acceptable surface defect to let the bearing operate in an appropriate condition. The FAA, when re-inspecting the petitioner in May of 2017, specifically asked the petitioner for what the technical data was that it was using to support these repairs. It asked again in a letter in January of 2018. In both cases, the petitioner was not able to produce any technical data. They produced an engine shop manual, is all that they had at the time the FAA conducted the inspection. The FAA does not assert that the original equipment manufacturer data is necessary. Technical data is necessary. The most straightforward way to get that is from the original equipment manufacturer. That is something that costs money. That is something that the repair station may have to go through a process with the original equipment manufacturer to get, but that's the most default way. As discussed in the record, you can also reverse engineer the component. That was something that the petitioner declined to do here. The reason that the, what is now being called equipment design data, becomes such a focus in the record at the hearing is because that is what the petitioner was pointing to at the hearing. Petitioner's owner, indeed testifying about the data at the hearing, talked about how, the quote is, that everyone in this room knows that we needed that data, and that they specifically testified that they didn't have it anymore because the person who had access to that computer had passed away. I don't know what was in that data. I don't know if what was in that data actually would have been appropriate technical data, but at hearing, that is focused on because that is what the petitioner was identifying to the agency. At the end of the day, from the FAA's perspective, the point is that there had to be something. OEM would have been the easiest, but there had to be something. From the agency's perspective, there was nothing. That's correct, Your Honor. Therefore, there's a problem with these regulations, with compliance with these regulations. Absolutely, Your Honor. Mr. Stevenson, let me, can I refocus you a little bit, because there are a couple of things that bother me, and I'm curious to hear the government's answer. First of all, one of the charges is intentional falsification under 12A. Yes, Your Honor. In fact, the findings, as I read the record, were that there were some materials that may have been omitted, but the materials on that particular form were not false. They were accurate. There may have been more information that could have been added. There is another section in the regulations, 12B, which covers material omissions. I don't know how you get a 12A intentional falsification on this record. Maybe material omissions, but that's not the charge, and I really, in reading the record and in reading the test you're using, I have no idea what you're talking about, material falsification. There's nothing in the record that I see that confirms my understanding of a material, of an intentional falsification here. Thank you, Your Honor. There was an intentional falsification here because the approvals for return to service executed by the petitioner falsely conveyed that the petitioner omitted some things. That's what the record says. It is true that they omitted something, but the fact that they omitted something does not mean they didn't intentionally falsify. Well, yeah, I understand where you might go with that, but there is a specific regulation that talks about sanctioning for material omissions, and there's not, what is it that you think, with respect to their material omission, took it to a higher level of an intentional falsification? Because they're two different regulations, and it seems to me you've simply written 12B out of the regulations because any time, it sounds like you're arguing, any time there is a material omission, which is covered, you're going to call it an intentional falsification. 12B and 12A are not mutually exclusive, Your Honor. The fact that something was omitted does not mean that it cannot be an intentional falsification. I understand. I'm trying to figure out how you get there in this case. In this case, the entries made by the petitioner are, they cite to OEM manuals, and they also cite to having done an overhaul. This conveys to a mechanic looking at this maintenance entry that the overhaul was performed in accordance with the OEM manual, which is not accurate, and that is why the statement is intentionally false. Well, so, no, but what that tells you is that it's inaccurate, at best, because I guess, so as Judge Edwards recounts the regulation, so it has a false statement provision and an omission provision, and let's just, I'll, let's just say for purposes of this question, I'm accepting your argument that those can overlap. Okay. And then there's an overlay that has to be intentional. So you could have a material omission that's unintentional, you could have a false statement that's unintentional, but for you to win, you have to show that there was intentionality, and with intentionality, I guess what confused me is that the ALJ never got to that question because the ALJ said that there's no falsity, and so the ALJ never even gets to the question of whether there's intentional falsehood, and so then it goes up to the NTSB, and when the NTSB looks at it, I didn't see anything in the opinion that would have resuscitated an intentional falsehood determination that was never made. Because as I understand the Board's decisions that come from our decisions, there has to be a determination that there was subjective, a subjective intention to mislead, and in order to do that, you have to show that even though the person has an explanation for why they were confused about the question, they actually intentionally misled with their answer, and I didn't see anything in the NTSB order that would show me that the NTSB found, even though there was an innocent explanation put forward, there was actually an intentional misleading. Well, in these cases, Your Honor, the FIA does not need to show an intent to mislead. There is an intent element, but the intent element is satisfied by knowledge of falsity, not, there's a, if we were to charge a fraud, so in this case, the question is, did they know what they were writing was false? Here, as I've mentioned- Did they intend to make a false statement? By omission, not what they were writing. By omission, what they wrote was not false. I mean, that was the point that was made in the record. What the point made in the record is what was there was not false. The individual, if you take a sentence in isolation out of there, it might be true, but the statement as a whole is false. If I took this out of the maintenance context for a second, the example I think of this is, for whatever reason, Your Honor asked me, Mr. Stevenson, how many children do you have? And my answer was, I have a son. And that was the totality of my answer. You would, I imagine, leave this conversation having concluded- No, no, I would have said I asked you how many, not whether you had a son. Yes. But that's not, that's not what I'm, I understand what you're saying. That's not what I'm getting from this record here. But that is the statement that they used a particular manual and they did an overhaul. What does material omission mean then? Sorry, well, a material omission would go beyond that because a material omission might include the complete absence of a record entry at all. If a mechanic performed maintenance and did not make a record entry as required by the regulations, that's not, that can't be a false statement because there's literally no statement. But if a repair station, because the regulation in question only applies to a repair station, if a repair station omits and like just entirely leaves out a maintenance record entry for the purposes of misleading, that is going to fall under 145-12B and could not fall under 145-12A. Can I back you up a little bit? I am, I thought I understood this case and now I'm wondering whether I really do. The, I look at the entry and it's number 12 in the authorized release. And the company says that it performed an overhaul in accordance with section 43.2, right? Yes. 43.2 means that they disassembled the bearing and put it back, right? But it also, as I understand, it also says that it requires that for that statement to be true, that the bearing was then tested in accordance with approved standards and technical data. Is it your argument that they didn't test it in accordance with technical data? Is that the point? Well, they did not test it in accordance with technical data at all. However, that was not the, that was not an argument that was advanced to the NTSB. And so at this time, it couldn't form the basis for the NTSB's decision. But, but I mean, Your Honor is, I think it's correct in identifying that they, they asserted that they had followed 43.2 and they didn't. But the falsification... Well, why didn't they? I mean, if you didn't, if you're not contesting that they tested it with in accordance with approved standards and technical data, if you've accepted that, then where is the, where's the false statement? Your Honor, the FAA does not accept that the petitioner tested it in accordance with approved technical data. But the false statement is... But you haven't argued that. That was, that was not advanced to the NTSB. It is, it was not advanced to the NTSB that they failed to comply with 43.2. However, it is the case that they failed to comply with 43.2. The falsity, for the falsity, one has to look at the entire statement. And if you look earlier in the statement, they talk about the work being performed in accordance with, and there's a manual citation to something that, it's a different citation for each of the 8130-3s because it's a different kind of bearing. But what they're citing to is that original equipment manufacturer manual. And when you have a citation to the original equipment manufacturer manual for the work performed, and then you say that you have performed an overhaul, that conveys to a mechanic reading this maintenance entry that you performed the overhaul in accordance with that original equipment, in accordance with an original equipment manufacturer manual. Are you referring to the sentence, long-term preservation performed IAW, the OEN manual on the date this certificate was prepared? Is that the sentence you're referring to? I didn't know, Your Honor. It would be a sentence earlier in the... What is IAW? IAW is mechanic speak for in accordance with. Oh. But again, in the manual, it's in the maintenance entry. It doesn't say OEM manual when it's talking about work performed in accordance with earlier. And that is because it is providing a citation to a specific provision. So, if I... So, let's see here. So, looking at... The particular one I'm looking at is Joint Appendix 68. That starts... Block 12 starts off by saying, work performed in accordance with GE CF6-80C2 engine manual. And it goes on to say bearing inspection section. And it gives another particular citation. That is an OEM manual for that particular bearing. That particular bearing on that particular work order is a GE. It was manufactured by... Are you saying that statement is false? Uh, that statement is false as describing an overhaul. That... The entry in block 12 is false. I thought your... Right, I thought your point... Correct me if I'm wrong. I thought your theory... I'm not sure it carries the day. But I thought your theory is that it says work performed, now I know, in accordance with engine manual and it points to a particular section. The idea is, okay, that tells us, if you look at that section, that there was an inspection performed pursuant to that section. But what it doesn't tell you is that there was a bunch of other stuff done, too, like disassembly and other things. And it's the omission of those other things that's problematic from your perspective because somebody looking at this wouldn't understand that that other work was done. Yes, and in conjunction with... Yes, was your answer... Wait a minute. Was your answer yes? Is that your theory? Or am I getting it wrong? I thought that was the material... That was the omission that renders this false. But maybe I don't have it right. It does leave those... It does leave that sort of detailed information out. But it's also that 12... No, it doesn't. Stop right there. How does it leave out that information when, in fact, they cite to 43.2, which is the overhaul, and an overhaul requires disassemblies. So anybody reading this knows that the bearing was disassembled and put back together. And they would conclude that that was performed in accordance with the original equipment manufacturer manual that was cited in that... No, no, no. Excuse me. Whoa, whoa, whoa. Please, counsel is appearing before us. We're not going to have comments from the audience. And a mechanic looking at this downstream after this component leaves the petitioner and goes to a parts broker and then goes to an air carrier who's going to decide whether or not to put it on an airplane, they would look at that and they would conclude that that was performed in accordance with... The disassembly is that. Yes, that the overhaul, the disassembly, the repair, if necessary, the repair in this case being the polishing, the reassembly, and the overhaul, they would conclude that the overhaul was performed in accordance with that OEM manual because there is no other provision cited for the basis for the overhaul. It is absolutely the case that it cites 43.2, but 43.2 is essentially the definition of overhaul. It's like saying, to say I overhauled in accordance with 43.2 is to say I overhauled it properly. But that's... As opposed to no mission, I'm still missing it. I mean, I'm further away now than I was when I first asked you. We're talking about an intentional mission. That's big time. Well, I'm intending to do something that's bad and I know it's bad and I'm going to go ahead and do it. What? What was that? Yes, and I think the... One of the strongest pieces of evidence that the falsity of the statement was intentional is to look at the underlying work orders as the petitioners have asked this court to do repeatedly. If you look at those underlying work orders, which are not charged as a separate falsification, but are relevant to the subjective understanding of the petitioner at the time they were making these statements, in those work orders, which in the Joint Appendix literally immediately follow each of the falsified 8130-3s, in their own forms, the petitioner has the option to check this binary checkbox that you can check MilSpec or you can check OEM tech data. And over and over again, the petitioner, as the basis for the work that it's performing, checks OEM tech data. Where is it? On what page are you on? I'm looking at the work orders. Thank you, Your Honor. I'm looking at the work order for the first... The one dated... The first one that begins at page 68. Thank you, Your Honor. Okay. For example, on Joint Appendix page 75, there is a... The page is titled Inspection and Findings Report. And there's a section that's titled Approved Tech Data. And it's you're approving in accordance with, and they can check either OEM tech data or MilSpec. And what is checked is OEM tech data. And again, there is... There is... It's undisputed in the record that they did not have OEM tech data. Their own expert at hearing testified that they had... Is that because of the missing computer? Well, the OEM tech data itself is not would have... OEM tech data is short for Original Equipment Manufacturer Technical Data. What could have been on the computer, whatever it was, could never have been OEM tech data. It conceivably could have been technical data, but it would never have been Original Equipment Manufacturer Technical Data. Why not? Because the Original Equipment Manufacturer Technical Data is something that is created by the company that produced the part. And the testimony at hearing was that the data that would have been on this computer was something that was developed by the petitioner when they were coming up with their own polishing process. Again, we don't know what was actually on there, but that's what they testified about it being. Are you saying they didn't have the Original Equipment Manufacturer's manual? They did not have the Original Equipment Manufacturer's manual necessary to do an overhaul. They had what was called and what is referred to as an engine shop manual. So they had an OEM manual that would have allowed them to perform this stylus inspection for surface defects. I don't understand a lot of this technical stuff, but suppose that the Original Equipment Manufacturer's manual had some instructions about how to insert the ball bearings in the ring. So when they finished the overhaul, they pulled the bearings out and they polished them, and they're putting them back and they go to the Original Equipment Manufacturer and follow the instructions on reinserting the bearings. Now, if that is what happened, this statement would be true, and the statement also in B12 would be true. That is not what happened. They did not have the OEM manual necessary to disassemble and reassemble the bearing. They also did not have the OEM tech data, which is the OEM tech data is not going to have instructions for taking the bearing apart and putting it back together. It's going to have information on what the condition needs to be after you're done polishing it. The petitioner in this case, presumably, was based on their arguments on petition for review. They would have been using the MIL-SPEC, the military specifications, for the assembly and disassembly. Now, that doesn't get them in compliance with the technical data issues because the MIL-SPEC is not technical data. It relies on you checking with the OEM technical data. But again, when you go back to what they're writing in their own work orders, their claim in their petition for review is that we were following the MIL-SPEC, that the MIL-SPEC was our tech data, but literally in their own work orders, they were checking, they were not checking MIL-SPEC. They were checking OEM tech data, which they did not have and which they knew that they didn't have. So when I hear this, just to abstract away from the ground level technicalities of it, what it sounds like is that you've got a case that the responses to the questions were incorrect. But what you have to show in order to show intentional falsification is that they were incorrect and the person filling it out knew they were incorrect. And what I'm missing from the record is there's testimony from the company that the company thought that this is all that question 12 was asking. And so what you need to have is an agency determination that when the company gives that response, they know that that response is incorrect. In fact, it has to be that there was intentional incorrectness in the responses. Don't get that from the ALJ because the ALJ never gets to intent. Then when you get to the NTSB, I don't see anything in the NTSB's order that resuscitates the absence of a knowledge-based credibility determination of the kind that the agency has said you need to show intentional falsification. Well, here the knowledge at issue is the knowledge of the falsity of the statement. And I understand the court will pass on whether or not my point here today is whether it was false. But if we take it for the moment that it was false, then the falsity that's being conveyed is that we were, that is an overhaul in accordance with original equipment manufacturer manuals. The petitioner knew that it was not overhauling in accordance with original equipment manufacturer manuals. It didn't have them. It knew it didn't have them. It knew that it was relying on for the process, not the data, but for the process. It knew that it was relying on the mil spec. And yet all that it wrote down was the OEM manual citations. It wrote down nothing about the mil specs. And so it knew that the statement that was being conveyed was false. It knew it was, the statement is conveying that they performed an overhaul in accordance with the OEM manuals. They knew that they were not performing the statements in accordance with the OEM manuals. Now, I understand that the, that at hearing, the petitioner asserted that it thought that what it was doing was okay, but that's not quite the same thing. If the petitioner, for whatever reason, believed that it was okay, if it knew that the statement was false, but it erroneously believed that it was okay to write that statement down anyway, that does not excuse them from the intentional falsification. That's where the distinction, it could get them out of, if we had charged them with a fraudulent statement, that would be a defense because an additional element of fraud might be an intent to deceive. But here, all you have to have is a knowledge of the falsity. Additionally, of course, the board, the only support for the notion that this was not an intentionally false statement or is the testimony of petitioner's owner, Mr. Gullell, the NTSB made an explicit credibility determination and found him not credible. And so, and that, that is a credibility determination that was supported by substantial evidence. And given that credibility determination, the board is free to disregard the evidence that this was not, that somehow would have not been intentional and look at the other, as we must usually do for intent and knowledge-based requirements, look at the circumstantial evidence, which includes, as we've discussed extensively here, these underlying work orders and what they... It's just a lot of that is you're making an argument to us that just doesn't appear to be in the NTSB determination. And all we have before us is what the NTSB said. Yes, Your Honor. All we, what we have before us is what the NTSB said. However, as this court has held, the underlying decision being reviewed does not have to be a model of clarity as long as the finding is there and the court can ascertain it and explanation from the parties is part of it. What page is the finding that the company didn't have the original equipment manufacturer's manuals? What page can I look at to find that? I am, I do not know off the top of my head, Your Honor, if there is a specific finding about that that the NTSB makes. And if there is, I don't know. There are several manuals involved in these work orders, right? Within a, within a given work order. The first one is GE. The second one is Pratt & Whitney. The third one is something ESMCFMI. I don't know what that is. And the fourth one is the same CFM, no, CFMI. So there are at least three different manuals involved, right? Yes, Your Honor, yes. Each, each of the four work orders, the four, there were four different bearings that were specifically charged in the FAA's complaint. Each of those was a different kind of bearing from a different manufacturer and had its own, so it would have its own original equipment. Okay, so I'll come back to, you know, you have asserted that the statement is false because they didn't have the OEM manual. So where do I find a finding with respect to these three different manufacturers? Well, I, I apologize, Your Honor. I don't have a citation to that off the top of my head. It was not disputed at hearing that they didn't have these. There, the first time that it was disputed that the, it was suggested that the petitioner might have actually had some sort of manual like this was in their final brief on the petition for review, and so I, I, I don't know that citation off the top of my head, and I, but I don't believe that there's an extensive discussion from the NTSB about how they, they don't have these manuals because that, it was not, it was not, it was never contended that they did, and I, but I can, I can provide a supplement to the court with a follow-up citation and discussion of that if that's desired. Where's the finding on major repair? The board found that the board, the board did not adopt the ALJ's unusual determination with regards to major repair, but the board did find that there was a violation of 14 CFR 145-201C2, which is the pertinent regulation for the major repair violations, and so necessarily the board found that there was a major repair. It's unsurprising that, again, this is not discussed extensively because there was no evidence whatsoever at hearing contradicting the assertion that the petitioner was performing a major repair. I know I'm out of time, so I don't want to go into an extensive thing on that, but I would note that the, the issue there was, is it a structural repair of an engine component? Critical does not play into the question of whether or not it's a major repair, so there was, there was evidence from the FAA expert that it was a major repair, no evidence by the respondent that it wasn't, so again, it's not surprising that the NTSB did not delve into a deep analysis on that point. Thank you. Thank you, counsel. Thank you. Two minutes for rebuttal. Thank you, Your Honor. With regard to the intentional falsification and the intent element, there is objective evidence in the record that the previous PMI did a thorough study which included Harold Baring's compliance with 8130-3 requirements, and, and they, he, he reviewed them all, two years worth, and said they were fine. And also the FAA guidance supports the, my client should be able to rely on FAA guidance that gives step-by-step, block-by-block instructions on how to fill out this 8130-3, and so that negates the intent element. The idea that they do not have OEM technical data, they had OEM inspection manuals, and that's what they cited. They said inspection was performed in accordance with these stated OEM inspection manuals, and those inspection manuals... No, it says work, I mean, I haven't, in front of me any longer, but it says work was performed in accordance with OEM, whatever the manual is, Pratt & Whitney or GE, it says work was performed, not inspection. Okay, good. Work was performed in accordance with OEM inspection manual, and then three of the four work 8130s say... I don't think it said inspection. Let me just take a look. Oh, you're right. Yeah, it's just the Berry inspection section. Okay, yeah. And then three of the documents say and other data acceptable to the administrator. Yeah, the first one doesn't. The first one doesn't, and if you look down through the work order, there is a return to service documentation that documents that this 8130-3 was performed, and it said there are customer instructions on how these are performed. Well, is it accurate to say that it was uncontested that the company didn't have these original manufacturer manuals? They did have the original, and it's in evidence. These manuals have been exhibits in this complaint. I thought I heard... Maybe I misheard. The FAA counsel say that the company didn't have them, so it couldn't have performed work in accordance with them because it didn't have the manuals. Well, the transcript describes that the Dr. Q and the PMI reviewed these manuals, actually said, now I'm going to talk about review of the manuals. And you say they're in evidence. They're in evidence, and the manuals themselves are exhibits to the... Yeah, the inspection manuals, not the Omaha manuals. But the inspection manuals, but he did not have access to the OEM design specs, and that's undisputed, but the design... The tasks that he was performing were approved based on the mil specs, and those are in the op specs, and they list 61 pages, two pages of op specs of what the FAA approved for him to use with the mil spec and other approved data, and then 61 pages of a list of the bearings by manufacturer that he was authorized to perform these tasks on. And that there's... In addition to the technical data that was admitted in evidence, he also, the transcript describes other data that was discussed and provided to the inspectors. And so the idea that there was no technical data is, it does not make sense, except they seem to be arguing on appeal that the mil spec is not technical data because it requires OEM information, but the mil spec... It was approved by the FAA and cited in the op specs, and the mil spec refers, the 122 mil spec, TO-122 refers to TO-102, which provides explicit instructions on how to assemble and disassemble, and that was the basis for this activity. Tell me what your understanding of the falsity charge is. I, well, the inspector admitted that the statement was not false, and so the ALJ determined that that violation was not supported by evidence. And then the NTSB, on its own, alleged that this was an omission, but omission is not alleged in the complaint. So, I don't think... What is your understanding of the alleged omission? What was omitted? Inspector Pitacora thought that all of, and the NTSB said, that all of the maintenance work that was performed by aero bearings should be set forth in Block 12. And that's the first time anyone has ever, and including, that's contrary to FAA guidance, that the block, there are other blocks that have the word overhaul, which there's a list of ways to fill out that block in the FAA guidance, and that provides a definition of what that word means, and it says put overhaul in the box, and it means this definition. There's not that much room. There's not that much room in Block 12. Right. So, he followed FAA guidance. He had an attorney advising him how to fill out these forms, and also the PMIs were approving, and Inspector Pitacora had reviewed, during the time of his time on the job, had reviewed these and said they were okay, and then all of a sudden they weren't okay. So, I don't think there was any falsity on these documents, and that was admitted by Mr. Pitacora. Thank you, Counsel. Counsel, the case is submitted. Stand, please.
judges: Srinivasan, Edwards, Randolph